UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA,       )
              Plaintiff,        )
                               )
         v.                     )      CRIMINAL ACTION
                               )      No. 10-10133-WGY-1
TREVOR A. WATSON,               )
              Defendant.        )
_____)
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    April 2, 2015

## I.    INTRODUCTION

Trevor A. Watson ("Watson") brings this federal habeas corpus motion under 28 U.S.C. § 2255, seeking postconviction relief from his conviction and sentence for witness tampering. In December 2010, Watson was found guilty of one count of attempting to kill a federal witness in violation of 18 U.S.C. § 1512(a)(1)(A) and (a)(1)(C). Here, Watson seeks collaterally to attack his sentence on the ground that, during his trial, he received ineffective assistance of counsel in violation of his Sixth Amendment rights.

### A.    Procedural Posture

#### 1.    Initial Charges and Trials

On March 3, 2010, a criminal complaint was filed against Trevor A. Watson ("Watson") in this Court for tampering with a

federal witness in violation of 18 U.S.C. § 1512(a)(1)(A) and
(a)(1)(C), and for retaliating against a federal witness in
violation of 18 U.S.C. § 1513(a)(1)(B). Criminal Compl., ECF No.
1.[1] Watson was subsequently indicted by a grand jury on March 21,
2010, charging two counts: (1) attempting to kill a federal
witness in violation of 18 U.S.C. § 1512(a)(1)(A) and (C), and
(2) using physical force and the threat of same against a
federal witness with the requisite intent to intimidate.
Indictment, ECF No. 10.

An eight-day jury trial, concluding on November 5, 2010,
resulted in a hung jury and a mistrial. Elec. Clerk's Notes,
Nov. 5, 2010. Shortly thereafter, the Court presided over a
second trial, lasting four days and concluding in early
December, in which the jury found Watson guilty of one count of
attempting to kill a federal witness in violation of 18 U.S.C. §
1512(a)(1)(A) and (a)(1)(C). Elec. Clerk's Notes, Dec. 2, 2010.
The government moved to dismiss the second count against Watson
as a lesser included offense, and the Court granted the motion.
Dismissal Count Two Indictment, ECF No. 58; see also Order, Dec.
6, 2010, ECF No. 56. The Court imposed a sentence on Watson of

---

[1] Although a motion under 28 U.S.C. § 2255 initiates a civil
action, all submissions related to this motion have been
docketed under the original criminal case giving rise to this
motion. Accordingly, all citations are to the criminal case
docket. See United States v. Watson, No. 10-cr-10133-WGY-1 (D.
Mass. 2010).

thirty years' imprisonment followed by five years of supervised release. Order, Mar. 11, 2011, ECF No. 61.

### 2. Watson's Direct Appeal

Watson appealed his conviction on March 17, 2011. Notice Appeal, ECF No. 67. He challenged his conviction on multiple grounds, alleging that evidence was improperly admitted at trial and that the prosecution's closing arguments contained unfairly prejudicial remarks. See United States v. Watson, 695 F.3d 159, 162 (1st Cir. 2012). On September 25, 2012, the First Circuit affirmed Watson's conviction. Id. at 169.

### 3. The Instant Motion

On January 14, 2014, Watson timely filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. Mot. Under 28 U.S.C. § 2255 Vacate, Set Aside, Correct Sentence Person Federal Custody, ECF No. 93. Watson's motion, alleging ineffective assistance of counsel, further requests that the Court grant him an evidentiary hearing and leave further to supplement the record with evidence supporting his claims. Def.'s Mot. & Mem. Relief Under 28 U.S.C. § 2255 ("Pet.'s Mem.") 1, ECF No. 94. The government filed a response to Watson's motion on March 4, 2014. Gov't's Opp'n Def.'s 2255 Mot. Vacate & Req. Ct. Inquire Pursuant 18 U.S.C. § 3006A ("Gov't's Opp'n"), ECF No. 96. The Court heard oral argument on Watson's motion on March 25, 2014. Elec. Clerk's Notes, Mar. 25, 2014, ECF No. 99.

## B.    Background Facts

### 1.    Curtis Best and the Camacho Conspiracy

On June 12, 2008, Curtis James Best ("Best") was indicted along with seven others in the District of Massachusetts for conspiracy to distribute cocaine and possession of cocaine with intent to distribute. United States v. Best, No. 08-cr-10168-NG-8 (Gorton, J.), Indictment, ECF No. 44. The indictment was the result of a Drug Enforcement Administration ("DEA") investigation into a cocaine trafficking and distribution enterprise ("the Camacho conspiracy") led by John Camacho. Trial Tr. vol. 1, 197:17-198:2, 200:9-12, Nov. 29, 2010, ECF No. 77. Best was arrested for his role in the conspiracy on April 25, 2008, and he began cooperating with the government shortly thereafter, providing information about the enterprise and his co-conspirators. Id. at 200:3-8, 202:1-7. From Best's information, the government identified additional members of the enterprise -- one of whom was the petitioner, Watson. Id. at 202:8-22.

Best pled guilty to the charges pending against him in April 2009 and agreed to work as a DEA confidential informant. Id. at 211:6-11; Trial Tr. vol. 2, 183:23-184:3, Nov. 30, 2010, ECF No. 79. He continued assisting the government in this capacity through at least 2010, when the events giving rise to the petition at bar occurred. See Trial Tr. vol. 1, 215:14-22.

### 2. Curtis Best's Stabbing and Watson's Arrest

On February 27, 2010, Best met a friend, Albert Rue, Jr. ("Rue"), at Ann's Barbershop in the South End neighborhood of Boston. Trial Tr. vol. 2, 205:10-19. Outside the barbershop, Watson approached Best and asked to speak privately with Best further down the street. Id. at 207:6-8, 207:16-21. After conversing briefly, Watson attacked Best with a knife, stabbing him repeatedly. Id. at 208:3-15. According to Best's testimony at trial, as Watson was attacking him, Watson said, "So you talking. So you telling, huh?" Id. at 208:18-20. After the attack was over, Rue drove Best to Boston Medical Center, where Best was treated for multiple stab wounds to his chest and arm. Id. at 5:14-6:3; see also Trial Tr. vol. 1, 150:3-5.

The following day, Best met with federal agents and described his attacker as a man with light to medium skin, short, stocky, and who spoke with a Spanish accent. Trial Tr. vol. 1, 218:6-14. Shortly thereafter, however, on March 2, Best was shown a photographic lineup and identified Watson as his attacker by nodding and giving a thumbs-up signal to the police officer conducting the procedure. Trial Tr. vol. 3, 44:6-15, 46:7-47:3, Dec. 1, 2010, ECF No. 80. On March 3, a warrant was issued for Watson's arrest. Trial Tr. vol. 1, 220:5-8. Watson, accompanied by counsel, turned himself into the Boston Police Department on March 10. Id. at 221:4-7.

### 3. Watson's Trial

#### a. Judicial Notice of Paul Pierce Case

At the outset of Watson's second trial, the Court delivered remarks to the jury taking judicial notice of facts related to a prior criminal proceeding against Watson involving the 2000 assault and battery of a Boston Celtics basketball player, Paul Pierce ("Pierce"). See Trial I Tr.[2] vol. 1, 22:2-12, Oct. 25, 2010, ECF No. 83; Trial Tr. vol. 1, 83:20-86:25. Although Watson had been acquitted of the more serious charges against him, the government sought judicial notice of facts related to the case on the basis that they were needed to contextualize key references in letters written by Watson after his 2010 arrest and seized from his prison cell and outgoing mail at the Plymouth County House of Correction. See Hr'g Tr., 2:18-25, 4:7-19, Oct. 6, 2010, ECF No. 86. Having earlier ruled that the letters could be admitted in evidence, id. at 4:13-14, the Court agreed that it ought take judicial notice of certain public facts from the Pierce trial transcript, id. at 12:3-6.

To that end, the Court recited facts to the jury describing, among other things, a September 25, 2000, attack on Pierce outside a Boston nightclub and the testimony of an

---

[2] Citations to transcripts from Watson's first trial, which ended in mistrial, are noted as "Trial I Tr." All other transcript citations refer to Watson's second trial, which are the proceedings being challenged by the instant petition.

eyewitness, Krystal Bostick ("Bostick"), incriminating Watson in the attack. Trial Tr. vol. 1, 83:20-84:18. After providing testimony to a grand jury and to Providence Police identifying Watson and a co-defendant as Pierce's attackers, Bostick had recanted her statements. Id. at 85:2-86:6. Watson's counsel, Martin K. Leppo ("Leppo"), made no contemporaneous objection. Pet.'s Mem., Ex. A, Aff. Martin K. Leppo ("Leppo Aff.") ¶ 22, ECF No. 94-1.

### b.   Tomasetta Affidavit

On the second day of trial, the government introduced in evidence the complete affidavit written by DEA Special Agent Brian Tomasetta ("Special Agent Tomasetta"), which had supported the original criminal complaint against Watson. Trial Tr. vol. 2, 12:22-13:5; see also Criminal Compl., Ex. 1, Affidavit DEA Special Agent Brian Tomasetta, ECF No. 1-1. A footnote in the affidavit describing Watson's prior criminal history was not redacted before the document was submitted to the jury. The footnote reads:

> WATSON has a significant and violent criminal history. In addition to numerous state arrests for assault and battery and drug and gun-related charges, WATSON was convicted of the following felonies: (1) Possession of a Class B controlled substance, Roxbury District Court, in 2008; (2) Assault and Battery, Suffolk Superior Court, in 2000; (3) Felon in Possession of a Firearm, U.S. District Court, District of Massachusetts, 1995; (4) Armed Robbery, Suffolk Superior Court, 1986; and (5) Robbery, Roxbury District Court, 1986.

Id. at 2 n.1. Another footnote in the affidavit asserts Special Agent Tomasetta's belief that Best "was fearful and hesitant due to WATSON's reputation for violence." Id. at 4 n.2.

### c. Government's Closing Arguments

On the second day of trial, the government called David Fredette ("Fredette"), an assistant district attorney with the Suffolk County District Attorney's Office. Trial Tr. vol. 2, 173:22-174:2. Fredette testified that in 2009, in the course of prosecuting one Taneika Britt ("Britt") for a double homicide unrelated to the instant case, he disclosed to defense counsel portions of a letter written by Best and containing information related to Britt's case. Id. at 174:6-175:15, 176:25-177:1. He also testified that defense counsel knew the name of the letter's author and were not restricted from disseminating Best's name. Id. at 177:4-7.

The government referred to Fredette's testimony in its closing remarks, speculating that his disclosure may have been the source of Watson's knowledge that Best was an informant:

> Maybe it was through the state murder case that ADA Dave Fredette testified about where Curtis Best's name was turned over to two defense lawyers, and there was no bar on the dissemination of that information. Maybe people on the street figured it out on their own by the very fact that Curtis Best was out, and they inferred, he had a long criminal history and he was facing serious charges, and they thought it was weird that a guy like that was on the street. Or maybe somebody, when Best was out in Boston he told you

providing all this proactive assistance, maybe
somebody figured it out on their own and they told
Trevor Watson. The how doesn't matter. Whichever way
it was, Trevor Watson figured it out.

Trial Tr. vol. 4, 15:20-16:7, Dec. 2, 2010, ECF No. 81.

Watson's counsel did not contemporaneously object to the
government's remarks.

### d.    Watson's Motives for Attacking Best

In an affidavit submitted to the Court along with the
instant motion, Watson's counsel attested to the following
statement:

> I believe that Mr. Watson may have informed me before
> trial that he and Best had known each other for a long
> time and that they had previously gotten along, but
> that at some point he and Best began having problems.
> In particular, I believe that Mr. Watson told me that
> he had lent Best some money to invest in Best's music
> enterprise but that Best had not paid him back. I also
> believe that Mr. Watson may also [have] told me that
> he believed that Best had a big mouth and was telling
> others in the community and on the internet or on
> Twitter that Best was suggesting that Mr. Watson was a
> snitch.

Leppo Aff. ¶ 12.

In between the conclusion of Watson's first trial and the
beginning of his second trial, the government gave Watson notice
of a statement made to federal agents by Watson's friend, Rue:

> Rue stated that he now remembered that at some point
> after driving Best to the hospital on February 27,
> 2010, Best said to him, in sum and substance, that
> Best thought that if Best had just given Watson money
> from the profits of Best's rap music, then Watson
> might not have stabbed him.

Notice Regarding Statement Gov't Witness ¶ 2, ECF No. 53.

Leppo did not cross-examine Rue at trial about this statement. In the course of cross-examining Best, Leppo elicited testimony that Best has a hobby-level involvement in the Boston entertainment business, Trial Tr. vol. 2, 225:13-16, that Best owed "a lot of money on the street," id. at 255:14-18, and that Best put out a music rap video in 2010 after being attacked, Trial Tr. vol. 3, 34:16-35:4.

### C. Federal Jurisdiction

As the Court that imposed Watson's sentence, this Court has jurisdiction over his motion for relief under 28 U.S.C. § 2255. Section 2255 provides that a prisoner in custody under federal sentence may, on certain grounds, "move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

## II. ANALYSIS

### A. Legal Standard

#### 1. Federal Habeas Relief Under Section 2255

The federal habeas corpus statute invoked by Watson, 28 U.S.C. § 2255, entitles him to collateral review of his sentence and, if appropriate, to postconviction relief, upon a showing that "his sentence was imposed in violation of the Constitution or laws of the United States." Sanders v. United States, 373 U.S. 1, 3 (1963); see also Weinberger v. United States, 268 F.3d

346, 351 (6th Cir. 2001) (identifying three grounds for the granting of the writ on this basis: "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid").

Such relief is available only after the petitioner has fully litigated his case on direct appeal, however, and when direct review is exhausted, "a presumption of finality and legality attaches to the conviction and sentence." Barefoot v. Estelle, 463 U.S. 880, 887 (1983). Accordingly, "[t]he principle that collateral review is different from direct review resounds throughout our habeas jurisprudence." Brecht v. Abrahamson, 507 U.S. 619, 633 (1993). "Postconviction relief on collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental unfairness." Singleton v. United States, 26 F.3d 233, 236 (1st Cir. 1994). To meet this standard, the petitioner must clear a "significantly higher" hurdle than he faces on direct appeal. United States v. Frady, 456 U.S. 152, 166 (1982).

When a Section 2255 motion is filed, the Court ought grant a prompt evidentiary hearing to make relevant findings of fact and rulings of law, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Clarifying this

standard, the First Circuit has held that a hearing is unnecessary "when a § 2255 motion (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case." Moran v. Hogan, 494 F.2d 1220, 1222 (1st Cir. 1974); cf. Pike v. Guarino, 492 F.3d 61, 70 (1st Cir. 2007) (criticizing district court for holding an evidentiary hearing for a § 2254 petition, and stating that "federal evidentiary hearings ought to be the exception, not the rule").

The petitioner bears the burden of establishing his entitlement to an evidentiary hearing, and to relief more generally, by a preponderance of the evidence. United States v. DiCarlo, 575 F.2d 952, 954 (1st Cir. 1978). Under a Section 2255 analysis, errors at trial are reviewed according to a stringent "harmless error" standard of review. Singleton, 26 F.3d at 236. Moreover, when the petitioner seeks relief based on alleged errors to which no contemporaneous objection was made at the trial itself, the petitioner "must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors." Frady, 456 U.S. at 168. Further, while the Court "must take many of [the] petitioner's factual averments as true, . . . [it] need not give weight to conclusory allegations, self-interested characterizations,

discredited inventions, or opprobrious epithets." <u>United States</u> v. <u>McGill</u>, 11 F.3d 223, 225 (1st Cir. 1993).

## 2. Ineffective Assistance of Counsel

Watson brings his Section 2255 motion on the ground that during his trial, he was denied the effective assistance of counsel in violation of his rights under the Sixth Amendment. Pet.'s Mem. 18. The two-prong test for evaluating such a claim is set out in <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial. . . .

<u>Id.</u> at 687.

A petitioner satisfies the first element of this test if he shows that his counsel's performance fell below an objective standard of reasonable effectiveness. <u>Id.</u> at 688. When evaluating counsel's past performance, the Court ought "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689. There is no set list of competencies that adequately encompasses the full range of situations a defense counsel faces. <u>Id.</u> at 688. Only choices "so patently unreasonable that no competent attorney would have made" them deviate from this range. <u>Knight</u>

v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (internal quotation marks omitted). What courts have called "Monday morning quarterbacking of trial tactics" is insufficient to prevail under Strickland. United States v. Valerio, 676 F.3d 237, 248 (1st Cir. 2012) (quoting United States v. Thomann, 609 F.2d 560, 566 (1st Cir. 1979)) (internal quotation marks omitted). With that said, "a single, serious error nonetheless can support a claim of ineffective assistance of counsel." Prou v. United States, 199 F.3d 37, 47 (1st Cir. 1999).

In addition to establishing unreasonably ineffective representation by counsel, the petitioner must also affirmatively prove that counsel's errors prejudiced his case. Strickland, 466 U.S. at 693. The Court evaluates the sufficiency of such a showing by examining the totality of the evidence that was before the trial factfinder. Id. at 695. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. This is a substantial burden. See Knight, 447 F.3d at 15 (calling the prejudice element of Strickland "a highly demanding and heavy burden" (internal quotation marks omitted)).

The Strickland Court took pains to point out that because effective counsel is so central to the fundamental fairness of

judicial proceedings, "no special standards ought to apply to ineffectiveness claims made in habeas proceedings." 466 U.S. at 698. But if a petitioner makes an insufficient showing on either the performance or prejudice elements of Strickland, he cannot prevail, and the Court need not examine both elements before denying the petitioner's motion. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which [may] often be so, that course should be followed." Id. at 697.

**B. Issues Already Litigated on Direct Appeal**

To start, two of the issues raised by Watson regarding his trial cannot be considered grounds for postconviction relief, because they have already been reviewed on direct appeal. When an issue has been settled by a prior appeal, it cannot be revived by a section 2255 motion. See, e.g., Withrow v. Williams, 507 U.S. 680, 721 (1993) ("If the claim was raised and rejected on direct review, the habeas court will not readjudicate it absent countervailing equitable considerations . . . ."); United States v. Doyon, 16 F. App'x 6, 9 (1st Cir. 2001) ("To the extent that [petitioner] is reasserting the argument that he made on direct appeal, he is barred from relitigating that issue on collateral review."). Both here and before the First Circuit, Watson has challenged (1) the Court's judicial notice of facts related to his involvement in an

assault of the Boston Celtics basketball player, Paul Pierce,
see Watson, 695 F.3d at 163-66; Pet.'s Mem. 30, and (2) the
admission in evidence of a law enforcement official's unredacted
affidavit, which brought into the record the two footnotes
mentioning Watson's previous criminal history, see Watson, 695
F.3d at 167-68; Pet.'s Mem. 34.

### 1. Judicial Notice of the Paul Pierce Case

In his Section 2255 motion, Watson argues that Leppo should
have objected to the scope of the Court's remarks taking
judicial notice of the Paul Pierce case, because they provided
"a selective narrative that had the effect of suggesting that
Watson had tampered with witnesses in the past." Pet.'s Mem. 30.
This is a repackaging of a claim that has already been rejected
by the First Circuit. On direct appeal, Watson argued that the
Court's judicial notice of the Paul Pierce case "constitute[d]
inadmissible 'prior bad acts' evidence pursuant to Federal Rules
of Evidence 404(b) and 403." Watson, 695 F.3d at 164. The Watson
panel disagreed, ruling that the Court's statements "merely
presented the jury with an abbreviated context for those
references, made by the appellant, that supported the narrative
and insinuated his consciousness of guilt." 695 F.3d at 166.

Because an appellate body already has determined that the
judicial notice was proper, Watson cannot now premise his
ineffective counsel claim on the presumption that such judicial

16

notice was improper. At this juncture, the issue of whether it was objectively unreasonable for Leppo to stay silent during the presentation of the Paul Pierce evidence is moot.

Moreover, even if the issue is not moot, fresh review by the Court does not yield a different outcome. The substance of the First Circuit's analysis remains persuasive even outside the context of direct appeal. In its opinion, the Watson panel observed that Watson's written references to Paul Pierce were "specially relevant in that they evince[d] a clear consciousness of guilt, the full weight of which would be lost on the jury absent the introduction of some limited factual foundation." Id. at 165. To that end, the First Circuit ruled, this Court's judicial notice "was narrowly confined to the material necessary," and additional cautionary instructions "further circumscribed any prejudicial impact." Id. From this, the First Circuit stated expressly that it could "discern no error, plain or otherwise" in the Court's judicial notice. Id. at 166.

These conclusions are compelling evidence that Leppo's purported mistake was not constitutionally deficient. First, they affirm that any contemporaneous objection would have been in vain. "[C]ounsel's performance was not deficient if he declined to pursue a futile tactic." Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999) (citing United States v. Wright, 573 F.2d 681, 684 (1st Cir. 1978)). Second, the determination by First

Circuit judges that the judicial notice was proper shows that counsel's decision not to object was well within the range of reasonable professional judgment. In light of these points, Watson has not established that Leppo's failure to object constituted unreasonably ineffective assistance.[3]

## 2. The Tomasetta Affidavit

The First Circuit has also addressed the admission of prior bad acts evidence contained in the Tomasetta affidavit. On direct appeal, Watson challenged the admission of the affidavit as plainly erroneous. Watson, 695 F.3d at 167. Here, Watson contends that the admission was "prejudicial," that it "left an indelible and irreversible impact on the minds of the jurors," and that Leppo's failure to contemporaneously object "probably spelled the difference between a conviction and acquittal." Pet.'s Mem. 34-35 (internal quotation marks omitted). This view of the evidence has been rejected. The First Circuit acknowledged in its opinion that the inadvertent admission of the affidavit footnotes was "clear and obvious error." Watson,

---

[3] The Court does not need to reach the issue of prejudice to rule on Leppo's failure to object here, but it acknowledges that Watson focuses his challenge on the prejudicial nature of the judicial notice. He specifically suggests that the First Circuit's analysis of potential prejudice was incomplete and merits reexamination. See Pet.'s Mem. 32. Particularly because contemporaneous objection would have been futile, Watson has not demonstrated a reasonable probability that the outcome of his trial would have been different if Leppo had objected during the Court's presentation. Under Strickland, counsel's purported mistake was not prejudicial.

695 F.3d at 167. But it ruled that the error still was not a prejudicial one:

> [T]o the extent that the jurors might have been aware of the information, it revealed little more than the fact that Watson had an extensive history of violent crime -- a fact of which they were already cognizant, given the proper admission of evidence concerning the Paul Pierce and Camacho cases.

Id. at 168. Given this controlling ruling, Watson cannot relitigate the question of whether the admission -- and, by extension, Leppo's failure to object to it -- was prejudicial.

Even if the admission could be relitigated, the Court is persuaded by the First Circuit's well-reasoned conclusion that Watson cannot meet his burden of establishing that the Tomasetta affidavit changed the outcome of his trial:

> The overwhelming evidence of Watson's guilt -- including, inter alia, the testimony of several eyewitnesses, which was largely corroborated by the content of Watson's self-incriminating letters -- significantly reduced the likelihood that the remarks unfairly prejudiced the jury's deliberations, and Watson has not proffered evidence remotely sufficient to potentially refute this conclusion.

Id. at 169 (discussing statements made in the prosecution's rebuttal to Leppo's closing argument, but describing difficulty of proving prejudice in a way that extends to the Tomasetta affidavit as well). Watson's arguments supporting the instant motion show that he has no further evidence to offer than what the First Circuit has already reviewed on this point. See Pet.'s Mem. 34-35.

## C. Watson's Knowledge of Best's Cooperation with Federal Agents

In addition to highlighting counsel's failures to object to evidence, Watson argues that Leppo committed errors of constitutional magnitude when he missed key opportunities to bolster Watson's best defense: that Watson did not attack Best for being an informant because Watson had no idea he was one. Upon close review of the trial record and Watson's submissions, the Court disagrees that these purported missed opportunities constituted ineffective assistance.

### 1. Leppo's Failure to Interview Witnesses

The first mistake Watson says his attorney made was at the investigatory phase. In an affidavit, Watson states that he told his lawyer about potential witnesses who could have offered key testimony in his favor. See Pet.'s Mem, Ex. B, Aff. Trevor Watson ("Watson Aff.") ¶ 13, ECF No. 94-2. Watson recalls encouraging his attorney to interview close friends and associates of Best, such as Rue, David Terrell, Michael Van Allen (Best's brother), and Ricky Knight, all of whom would have been able to testify that they did not know Best was cooperating with authorities. Id. It does not appear that Leppo followed through on all of these potential leads. Id. ¶ 14; see also Leppo Aff. ¶ 10 (averring that because of time constraints,

Leppo failed to interview David Terrell and Darius Manor despite Watson's requests).

The Court is skeptical that it was constitutional error to fail to interview the witnesses Watson mentions. "The decision to interview potential witnesses . . . must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case." Lema v. United States, 987 F.2d 48, 55 (1st Cir. 1993). At trial, Leppo did develop evidence, primarily through Rue's testimony, that people very close to Best had no idea he was an informant. See Trial Tr. vol. 1, 153:8-154:2. The testimony of other associates may have been less useful than Rue's and thus not worth pursuing, or it may have even been harmful. For example, extensive evidence was presented at trial of David Terrell's involvement in the Camacho conspiracy. See, e.g., Trial Tr. vol. 2, 55:11-23. Testimony from him would likely have been vulnerable to impeachment.

Watson also does not convincingly show that Leppo prejudiced Watson's case by failing to interview and present testimony beyond Rue's. Watson's affidavit does not offer evidence or reasoning that Best's other associates would have offered new or different information had they been called to the witness stand. It stands to reason, then, that additional

testimony would have been more cumulative than persuasive and that it would have failed to impact the outcome of the trial.

Finally, as a technical matter, Watson's memorandum supporting his section 2255 motion is silent on the matter of these purported failures to interview, suggesting that he has waived this issue. Cf. Pratt v. United States, 129 F.3d 54, 62 (1st Cir. 1997) ("It is firmly settled in this circuit that arguments not advanced and developed in an appellant's brief are deemed waived.").

### 2. Leppo's Failure to Object to the Government's Closing Arguments

Watson also asserts that during closing arguments, Leppo mistakenly failed to object to key statements by the government that critically damaged the defense that Watson did not know Best was an informant. Pet.'s Mem. 27. In its arguments, the government referred to earlier testimony that Best had been an informant in the unrelated trial of Toneika Britt, and it expressly suggested that Watson may have learned about Best's cooperation through disclosures made in the Britt proceedings. See Trial Tr. vol. 4, 15:20-16:7. According to Watson, Leppo's failure to object to these comments "allow[ed] the Government to fill in [the] blank with its highly speculative theory" and thus was grave constitutional error. Pet.'s Mem. 24. For several reasons, this view of Leppo's silence is unavailing.

As a preliminary matter, it is not obvious why the government's statement was improper. "Where the defendant has presented a defense, . . . the government is permitted to discuss competing inferences from the evidence on the record." United States v. Glover, 558 F.3d 71, 77 (1st Cir. 2009); see also United States v. Mount, 896 F.2d 612, 625 (1st Cir. 1990) ("Although it is the jury's job to draw inferences, there is nothing improper in the Government's suggesting which inferences should be drawn."). Here, the government relied on valid testimony to suggest an inference counter to Watson's defense that he did not know Best was an informant. Watson does not offer any analysis beyond conclusory statements showing why the government's actions fall outside the scope of the First Circuit's rulings.

Moreover, the trial transcript shows that Leppo did not allow the government's remarks to lie undisturbed. He directly rebutted the government's suggested inference in his own closing argument, stating that drawing a connection between the Britt case and Watson defied "common sense." Trial Tr. vol. 4, 26:20; see also id. at 26:14-22 ("How can you make that leap that [Watson] would find out about [Best's involvement in the Britt case?]"). These remarks suggest that Leppo understood fully the potential impact of the government's closing argument and made a strategic choice to counter it through his rebuttal, rather than

23

through an objection that likely would have been overruled. In light of the Court's strong presumption that counsel made "all significant decisions in the exercise of reasonable professional judgment," Strickland, 466 U.S. at 690, Watson does not meet his burden of establishing unreasonable professional error here.

Watson also fails to demonstrate that the failure to object prejudiced the outcome of his trial. ADA Fredette's testimony and the inference it supported were simply not linchpins of the government's case. There was plenty of evidence suggesting that Watson knew or could have known about Best's cooperation -- certainly enough to sustain a finding of intent even without evidence demonstrating how he knew. See, e.g., Trial Tr. vol. 4, 13:3-6 (referring to evidence of Watson's involvement in the Camacho conspiracy); id. at 15:24-16:3 (suggesting that "people on the street" could have deduced that Best was an informant based on the lenient treatment he received); id. at 17:22-23 (recalling Best's testimony that Watson said, "You talking, huh?" in the midst of his attack); id. at 19:4-21:13 (analyzing letters written by Watson that suggest consciousness of guilt). Even without any of Fredette's testimony, the evidence of Watson's guilt remains, as the First Circuit put it, "overwhelming." Watson, 695 F.3d at 169.

The Court also observes, somewhat self-servingly, that the First Circuit has held that cautionary instructions delivered to

the jury by this Court further minimized the risk of prejudice from the government's closing arguments. In considering a different challenge to the prosecution's closing arguments, the First Circuit ruled that "[this Court] limited the risk of any residual prejudice by strongly cautioning the jury that counsel's closing arguments were not evidence, and directing the jurors to base their verdict solely on the evidence as they remembered it." Id. (citing United States v. Meija-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)); see also Trial Tr. vol. 4, 46:24-47:9 (containing the Court's relevant remarks). The First Circuit's reasoning applies equally well to the instant issue, because the Court's cautionary instructions applied to all parts of the prosecution's closing arguments.

### D. Counsel's Failure to Present an Alternative Motive for Watson's Actions

Finally, Watson contends that his representation was constitutionally ineffective because Leppo failed to investigate or present affirmative evidence of alternative motives Watson may have had for attacking Best. See Pet.'s Mem. 25-27. Both Watson and his counsel attest that counsel was aware of at least two reasons Watson had to dislike Best wholly separate from his government cooperation. Watson Aff. ¶¶ 11, 15; Leppo Aff. ¶ 12. At the time of the stabbing, Watson says, Best owed Watson $4000, the balance of a loaned investment in Best's fledgling

music career. Watson Aff. ¶ 11. What's more, Best had been spreading rumors suggesting that Watson, rather than Best, was a federal informant. Id. ¶ 15. Understandably, these problems had created a rift in their once-close relationship. Leppo Aff. ¶ 12. That such matters were not presented to the jury, Watson says, was a serious error on Leppo's part.

The record does not establish, however, the kind of grave error on counsel's part which warrants constitutional relief. First, Leppo's available means to introduce evidence of Watson and Best's earlier conflict were limited. See Pet.'s Mem. 25 (conceding that "[a]t the first trial, counsel had no extrinsic evidence of [other] motivation[s] and therefore, perhaps reasonably, did not present an alternative motive at trial").

Second, Leppo appears to have made genuine efforts to introduce evidence of that history at the second trial, to the extent such evidence was available. For example, in between Watson's first and second trials, Best's friend, Rue, made a statement to the government supporting the theory that Watson actually had attacked Best because of an outstanding debt. See Notice Regarding Statement Gov't Witness, ECF No. 53. For the first time, Rue recalled

> [T]hat at some point after driving Best to the
> hospital on February 27, 2010, Best said to him, in
> sum and substance, that Best thought that if Best had
> just given Watson money from the profits of Best's rap
> music, then Watson might not have stabbed him. When

> asked specifically when and where he had had this
> conversation with Best, Rue was not sure.

Id. ¶ 2 (footnote omitted). The trial record shows that Leppo

fully appreciated the importance of Rue's statement and that it

was an ongoing consideration in Leppo's trial strategy. In

pretrial discussion, the Court engaged in an extensive colloquy

with the government and Leppo regarding the admissibility of

testimony from either Rue or Best regarding Watson's motives.

See Trial Tr. vol. 1, 5:11-18, 6:19-8:17. Leppo indicated, among

other things, his plan to call and then recall Rue to the stand

in order to elicit evidence of Watson's possible alternative

motives. Id. at 8:15-17.

The plan went somewhat awry, in no small part because

Best's statements to Rue in the aftermath of the stabbing were

inadmissible hearsay. On the first day of trial, the Court

sustained the government's objections to Leppo's attempts to

question Rue about his statement to the government. See Trial

Tr. vol. 1, 165:16-166:9. On the third day of trial, Leppo and

the Court discussed counsel's still-active plan to recall Rue,

and the Court suggested that Leppo "think about" the choice to

recall Rue in light of the government's position that Rue's

testimony as to Best's state of mind ought be excluded. Trial

Tr. vol. 3, 3:16-19, 4:1-5. Perhaps in response, Leppo later

decided not to recall Rue, telling the Court that he had

"resolved that Rue situation." Id. at 48:5-6. These parts of the trial record convince this Court that Leppo's failure to follow through with his plan was not error, but rather a strategic choice, which cannot be the basis for granting a Strickland claim.

Watson also criticizes Leppo's inability to elicit testimony from Best that would have established the substance of Rue's statement. Pet.'s Mem. 26. In cross-examining Best, counsel only elicited testimony that Best had conversed with Rue on the way to the hospital, Trial Tr. vol. 3, 29:11-23, and that Best generally had considerable debts, Trial Tr. vol. 2, 255:14-18.

Admittedly, the overall effect of Leppo's efforts in this part of the trial is not overwhelming. It is not apparent, for example, why he did not attempt to ask Best more directed questions about debts he owed to Watson. This could have established much more clearly an alternative motive for Watson's attack. But the trial record leaves ample room to conclude that Leppo's lack of emphasis on the alternative motive theory was a strategic decision, rather than an unprofessional blunder. He may well have decided, for instance, that he could not rely on Best to admit to the money he owed Watson, and without corroborating testimony from Best, Leppo had virtually no other way to establish an alternative motive.

After attempting and failing to introduce the substance of Rue's statement to the government, Leppo appears to have abandoned the alternative motive theory in favor of simply challenging whether Watson could have known Best was an informant. In closing arguments, Leppo asserted that

> [T]here is one issue in this case only, one simple issue, after all the evidence you've heard, all the arguments, all the exhibits, and it's what Judge Young told you: Did Trevor Watson know on February 27th of this year that Mr. Best was an informant or that he was going to testify in some proceeding. That's the issue. Cut through all of it. That is the sole issue, his knowledge of Mr. Best.

Trial Tr. vol. 4, 23:24-24:6. The Court cannot conclude that it was ineffective assistance to choose this simpler trial strategy over a more complex approach with little reliable evidence to support it. Censuring trial tactics with this level of scrutiny is precisely the kind of hindsight review Strickland disallows.

Lastly, even if Leppo committed constitutional error here, Watson has not made a sufficient showing that the mistake prejudiced his case. While evidence of an alternative motive would have undermined the government's theory of Watson's state of mind, it would have been countered by evidence of, inter alia, Watson's remarks alluding to federal cooperation while attacking Best, Watson's lifelong close relationship with Best, Watson's involvement in the Paul Pierce case, Watson's consciousness of guilt in his prison letters, the threat that

Best's informant testimony posed to Watson, and the porousness of the institutions keeping Best's identity secret. There was considerable evidence on which to base a finding, beyond a reasonable doubt, that Watson was guilty of witness tampering. The Court holds that there is <u>not</u> a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 694.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES the petitioner's motion under 28 U.S.C. § 2255 to vacate his conviction and sentence.

**SO ORDERED.**

WILLIAM G. YOUNG
DISTRICT JUDGE

April 3, 2015,
A certificate of appealability will issue as to each of the matters discussed herein.

William G. Young
District Judge